FINLAYSON et al. v. DENVER & R. G. W. R. CO. et al.

No. 6891.   Decided August 21, 1946.   (172 P. 2d 142.)

See 11 C. J. S., Boundaries, sec. 50; 18 Am. Jur. 758, 1038. Ambiguous description—call for artificial monument, or for railroad as boundary, note, 68 A. L. R. 31, 93.

*Farnsworth & Van Cott* and *Grant H. Bagley,* all of Salt Lake City, for appellants.

*George S. Ballif,* of Provo, for respondents.

PRATT, Justice.

Respondents brought this action against appellants for $1000 damages for occupying some .15 acres of respondents' lands in the construction of a fill for a new railroad line

passing respondents' properties. The jury returned a verdict of $472 for which sum judgment was entered against appellants. This appeal followed.

Two issues are raised upon the appeal: (1) Was the property occupied by appellants included in a deed from respondents to appellants? (2) Were severance damages properly allowable under the facts of this case?

(1) Respondents allege they were the owners of the following described property:

"Commencing 19.60 chains South and 16.54 chains East from the Northwest Corner of the Northwest quarter of Section 2, Township 7 South, Range 2 East of the Salt Lake Base and Meridian; thence South 37° East 12.26 chains; thence North 83° East 3.58 chains; thence North 35¾° West 18.16 chains; thence South 3° 20' West 5.38 chains more or less to the place of beginning. Area 4.99 acres * * *."

That in August 16, 1943, they executed and delivered to appellants the following described piece of their property.

"Commencing 19.60 chains South and 16.54 chains East from the Northwest Corner of the Northwest quarter of Section 2, Township 7 South, Range 2 East, Salt Lake Base and Meridian; thence South 37° East 12.26 chains; thence North 83° East 3.58 chains to the point of beginning of the land herein and hereby conveyed, being a point in the Southwesterly line of the right of way of the Denver and Rio Grande Western Railroad Company 50 feet southwesterly at right angles from the center line of the original main track of said railroad company, or 32.78 feet Southwesterly at right angles from the center line of present operated mainline track; thence Northwesterly along said right of way line and parallel with said original main track 700 feet; thence southeasterly in a straight line 691.8 feet to a point in the southerly property boundary of said grantors, South 83° West 17 feet from said point of beginning; thence North 83° East along said southerly property boundary 17 feet to the point of beginning—containing 0.13 of an acre more or less in the Southeast Quarter of the Northwest Quarter of said Section 2."

That appellants occupied some .15 acres more than is covered by the deed—a strip, they allege, more than 700 feet long and 10 feet wide.

During the course of the trial, counsel for respondents, in a discussion with the trial court, had this to say:

"Our point is that it [the deed] doesn't describe the property that this man [one of respondents] agreed to sell in this preliminary agreement that I'm trying to show."

Again he said:

"We are attemping to show an agreement was made and then they [appellants] presented something purporting to carry out that agreement, and it wasn't that at all."

Recognizing that this was not within the pleadings, the court and both counsel had considerable argument, which ended in the question of what was intended by the deed. Testimony as to the intention of the parties was introduced in the trial upon the theory that there was ambiguity in the deed. In his instruction No. 11, the court said this:

"Thus in descriptions of real estate contained in a conveyance, if the point of beginning, or if any point or course therein is described in various ways, and the different manners of description of that point or course result in different or distinct points or courses, it is the duty of the court and not of the jury to determine from the instrument and all of the facts and circumstances surrounding the making, execution and delivery of the instrument, which of the contrary points or courses were intended by the parties to be controlling and binding upon them * * *."

In Instruction No. 12, the court set out his version of the deed as follows:

"Beginning at a point in the Southwesterly line of the right of way of the Denver and Rio Grande Western Railroad Company, as such Southwesterly line existed prior to the 16th day of August, 1943, the date of the said conveyance, which point of beginning is also the corner post of the intersection of such right of way line with the fence along the Southeasterly portion of the plaintiffs' property, running thence northwesterly along the said right of way line and parallel with the original main track of the Denver and Rio Grande Western Railroad Company 700 feet, thence Southeasterly in a straight line 691.8 feet to a point in the southerly fence line of the grantors, south 83 degrees West 17 feet from the point of beginning, thence North 83 degrees East along said Southerly fence line 17 feet to the point of beginning."

We are of the opinion that there is no ambiguity in the deed of conveyance and that testimony of the intention of the parties should not have been admitted. To illustrate this: Let "B" represent the point from which the land conveyed is to be bounded—"* * * being a point in the southwesterly line of" the railroad right of way. This right of way line is a known fence line. How do we get to that point in order to start that bounding? We start from the northwest corner of the northwest quarter of Section 2, Township 7 South, Range 2 East, Salt Lake Base and Meridian. We travel in a general southeasterly direction "19.60 chains South and 16.54 chains east"; thence southeast again, but at a different angle: "south 37°00′ East 12.26 chains"; then we turn northeast: "North 83°00′ East 3.58 chains"—and we are supposed to have arrived at point "B." Now it may be that we are not exactly on the southwesterly line of the railroad right of way; but, if not, the law says that our line may be extended (that is, continued in the same direction) so far as is necessary to bring us upon that southwesterly line, as that is an "artificial monument" which must take precedence over metes and bounds if there is a conflict—this upon the theory that artificial monuments are less apt to be erroneous than are computations. *Bullion Beck & Champion Mining Co.* v. *Eureka Hill Mining Co.,* 36 Utah 329, 103 P. 881; *Park* v. *Wilkinson,* 21 Utah 279, 60 P. 945.

Now what about the "50 feet southwesterly at right angles from the center line of the original main line track" or the "32.78 feet southwesterly at right angles from the center line of" the railroad company's "present main track"? Obviously these two descriptions are not intended to take the beginning point—point "B"—out of the southwesterly line of the railroad right of way. They are alternative ways of checking the location of point "B", measured from two different monuments—but their accuracy depends upon measurements, and, if they are in conflict with the first description, they, too, must give way to a fixed monument point. Especially is this true when they

lack any compass location along the railroad right of way except such as is found in the calls recited above as the means of locating point "B" initially. In other words, neither the 50 foot description nor the 32.78 foot description could be used by itself to locate point "B." There is no compass location Northwest or Southeast upon either main line track from which to start the right angle measurement. Point "B" is located first by the initial calls discussed, then, having been located as a fixed point in the southwesterly line of the railroad, it is spoken of as being certain distances southwest from either of two points available to any interested party who may wish to check the location. The lower court was in error in its eleventh instruction when it, in effect, treated this description as containing three ways of locating point "B" which were in conflict. The 50 foot description and the 32.78 foot description were useless without the calls measured from the northwest corner of the northwest quarter section.

Having located point "B" as the point from which to start bounding the deeded land, where do we go? We go northwesterly along this right of way line—the fence line we have designated as the monument—700 feet. To avoid confusion in compass directions let this be said: The railroad right of way runs northwest and southeast. Naturally it has two sides, one of which lies northeast of it; the other southwest of it. Thus when the expression "southwesterly line" is used, reference is intended to the side of the right of way which is on the southwest thereof; but that southwesterly side ("line") itself runs northwest and southeast as does the whole right of way.

Thus we have proceeded along this southwesterly side of the right of way 700 feet in a northwest direction—which is spoken of as being parallel to the original main line track. Now, at this point we leave the right of way and run southeasterly 691.8 feet, to a point South 83°00′ West 17 feet from the point of beginning—which point is to be found in the "southerly property boundary" of the grantor's property. It does not appear that the quoted words have reference

to any monument. That being the case, undoubtedly it was intended that reference was to a metes and bounds and not a monument description of the grantor's property line. The lower court concluded that there was ambiguity as to this south boundary of the grantor's property and used the expression "southerly fence" line. There might be justification for that belief, if it were not for the fact that, upon the face of the deed it was the intent of the parties to fix the point by measurement rather than by reference to any object which could be used as a monument. The testimony as to the intent of the parties, other than appears in the deed, was improperly admitted. The 691.8 feet southeasterly and the North 83°00′ East 17 feet indicate lines of boundary which intersect at a point "in the southerly property boundary" of the grantor's property. No indication is given as to any object that the parties had in mind as constituting that south boundary, and in view of the fact that the measurements and compass directions are given to get there, it is hard to believe that the parties had anything else in mind other than a metes and bounds description. The intersection of those two lines was the point with which the parties were concerned. This is emphasized by the fact that "along that southerly property boundary" is defined immediately thereafter as "North 83°00′ East" 17 feet to the point of beginning—merely a reversal of direction from that used to locate the intersection of the two lines.

If it were conceded that the respondents' south boundary line and their south fence line were identical, then the description of the lower court would have, as a matter of coincidence, been correct. If, however, a comparison is made between the deed of Ross to respondents of the 4.99 acres (with particular reference to that part reading "thence North 83° East 3.58 chains") and the deed of respondents to appellants (with particular reference to the 83° and 17 feet) it will be seen that they are both dealing with the south boundary line (not fence line) of respondents' property. The lower court, by using the expression "fence line," places an artificial monument in the description, which, if not

coinciding with the south boundary line, would take precedence over that line upon the same principles as have been set out above as to the railroad right of way fence line. Such an interpolation is contrary to the intent of the parties as indicated on the face of the deed.

(2) The only evidence submitted by respondents as to the damages was that of Mr. Finlayson, and such inferences as might have been drawn from the amount paid respondents by appellants for the .13 of an acre. The jury returned a verdict of $172 for the piece taken— which was the value testified to by respondent Finlayson— and $300 damages to the remaining property by reason of the taking. The background for this later sum is rather obscure.

Counsel for respondents, still laboring upon the belief that the deed did not conform to the original agreement of the parties, conceived the idea that there was an old railroad fence line east of the east boundary of the description of the deed. Such a belief seems to be founded upon the testimony of a surveyor who made a survey for respondents. Be that as it may however, acting upon that theory, counsel sought to recover from appellants for .12 of an acre lying east of the description contained in the deed. Counsel's theory is illustrated by his question and statements as follows:

"Mr. Finlayson, assuming that the railroad company has taken this .12 of an acre in addition to the conveyance you made to them, and the .03 of an acre, making in all .15 of an acre of that ground; assuming that that is severed now from the practically five acres of ground you had there before that taking; what would you say is the market value of the ground now, after that severance and after that taking?" Page 88 of transcript.

\* \* \* \* \* \*

"It is this, of Your Honor please. The old fence was at a point eastward from the conveyance description. He has testified that that fence existed there and has been there for 25 years last past." Page 91 of transcript.

\* \* \* \* \* \*

"The surveyor further shows on said exhibit .12 of an acre between

plaintiffs' original east fence line and the east line of the conveyance in the deed, and .03 of an acre between the present existing fence defendants constructed and the west line described in the deed, making a total of .15 of an acre not described in said deed and which defendants have included behind the said fence." Page 5 of respondents' brief. See also Exhibit "D".

Testimony was permited upon this theory, and, as a result, the jury undoubtedly believed they were to determine the value of at least .12 acres of this land as being east of the description in the deed. Obviously, this was an error as the deed conveyed to the appellants lands immediately west of appellants' lands and anything east of the land described in the conveyance would be part of appellants' own land. This was true even under the lower court's interpretation of the deed. There was no issue before the court as to any error in the drawing up of the deed. We cannot say from the record that the jury believed that there were .12 acres of respondents' lands taken at any other location than east of that described in the deed—and this location was erroneous.

Undoubtedly, if appellants have occupied land belonging to respondents and have constructed a railroad fill thereon in such a manner as to substantially abridge or destroy respondents' right to its use and enjoyment, there has been a taking of the land. And if the amount so taken is in excess of the land described in the deed, they should reimburse respondents for the market value of the property taken, and for any damage to the remaining property as a result of that taking, if any such damage there be. *State by State Road Commission et al.* v. *District Court, Fourth Judicial District, in and for Utah County*, 94 Utah 384, 78 P. 2d 502; 29 C. J. S., Eminent Domain, § 139, 140; 104-61-11, U. C. A. 1943. There is evidence in this case, which, if believed to be true and accurate, indicates that appellants did occupy more land of respondents than was contemplated by the deed. The confusion in the case arose out of a failure on the part of counsel and the court to adhere to the issues as set out by the pleadings. The jury was called

upon to pass upon occupancy of .12 of an acre of appellants' land, not respondents'.

Under the circumstances, this court is of the opinion that the judgment should be set aside and the case remanded for a new trial to conform to the views herein expressed. It is so ordered. Costs to appellants.

LARSON, C. J., and McDONOUGH, WADE, and WOLFE, JJ., concur.